PBT

$350

(1)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

[UNDER SEAL] :
:
:
Plaintiffs, :
:
: **12    1464**
:
v. : CIVIL CASE NO.
:
: MATTER FILED
[UNDER SEAL] : <u>UNDER SEAL</u>
:
Defendant. : <u>JURY TRIAL DEMANDED</u>
:

<u>FALSE CLAIMS ACT COMPLAINT</u>

**FILED**
MAR 2 3 2012
MICHAEL E. KUNZ, Clerk
By _____ Dep. Clerk

# DO NOT FILE ON PACER

# DO NOT PLACE IN PRESS BOX



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 12     1464 |
| EX REL. DANIEL DiMARZIO | : | |
| | : | |
| Plaintiffs, | : | |
| | : | **CIVIL CASE NO.** |
| | : | |
| v. | : | **FILED** |
| | : | <u>UNDER SEAL</u> |
| FIRSTSOURCE SOLUTIONS LTD.; | : | |
| FIRSTSOURCE SOLUTIONS USA, LLC; | : | |
| and MEDASSIST, INC. | : | <u>JURY TRIAL DEMANDED</u> |
| | : | |
| Defendant. | : | |

Qui Tam Plaintiff/Relator Daniel DiMarzio, by and through his counsel, Pietragallo Gordon Alfano Bosick & Raspanti, LLP, brings this civil fraud action against FirstSource Solutions Ltd., FirstSource Solutions USA, LLC, and MedAssist Inc., on behalf of the United States of America and alleges, based upon personal knowledge and relevant documents, as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants FirstSource Solutions, Ltd. ("FirstSource"), FirstSource USA LLC ("FirstSource USA"), and MedAssist, Inc. ("MedAssist"), and/or their agents and employees in violation of the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*

2. Defendants FirstSource, FirstSource USA, and MedAssist are providers of

revenue cycle management services to hospitals in Pennsylvania, Alabama, Arizona, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Michigan, Mississippi, North Carolina, New Hampshire, Nevada, Ohio, Tennessee, and Texas.

3. Defendant FirstSource USA is a wholly owned subsidiary of FirstSource.

4. Defendant FirstSourceUSA acquired MedAssist on or about March 31, 2010.

5. Defendants' revenue cycle management services for hospitals include, but are not limited to, assisting hospitals with the conversion of self-pay (uninsured) patients that are treated in the hospital emergency rooms, as well as inpatient basis, to the Medicaid Program. Defendants' refer to these services as their "MedAssist Eligibility Services."

6. Hospitals have a financial incentive to convert self-pay (uninsured) patients to the Medicaid Program because most self-pay (uninsured) patients do not have the financial resources to pay the hospital for treatment. As a result, hospitals will often have to wait significant periods of time for payment for medical services provided to self-pay (uninsured patients), and in many cases may receive little or no payment at all. By converting self-pay (uninsured) patients to the Medicaid coverage, hospitals are guaranteed full and rapid payment (at government funded levels) for the services provided to those self-pay patients.

7. Defendants' provide their client hospitals with MedAssist Eligibility Services by staffing those hospitals with employees, known as Patient Account Representatives ("PARs"). Defendants' PARs assist client hospitals with converting self-pay patients to the Medicaid Program by:

- Interviewing all self-pay patients;

- Reviewing the patient's medical records;

- Completing the forms necessary for the Medicaid Program to assume coverage for the

patient's inpatient treatment or emergency room visit, and any resulting medical treatment;

- Submitting those forms to the applicable county and/or state agency responsible for evaluating and approving Medicaid coverage for the patient's hospital visit, and any resulting medical treatment;

- Following-up with the applicable county and/or state agency to ensure approval of Medicaid coverage for the patient's hospital visit, and any resulting medical treatment.

8.     Hospitals receiving Defendants' MedAssist Eligibility Services pay Defendants a percentage of the reimbursement the hospital receives from the Medicaid Program for self-pay patients who have been successfully converted to Medicaid coverage.   In other words, Defendants only get paid by their client hospitals for those self-pay patients who they successfully convert to Medicaid coverage.   Defendants therefore have a direct financial incentive to maximize the number of self-pay patients converted to Medicaid coverage.

9.     Defendants have, since at least 2009, engaged in a pattern and practice of intentionally submitting, and/or causing the submission of, thousands of false and fraudulent claims to the Medicaid Program for the conversion of self-pay (uninsured patients) to Medicaid coverage.

10.    Defendants carried out this scheme by knowingly and intentionally submitting, and/or causing the submission of, thousands of claims which falsely and fraudulently represented that self-pay (uninsured) patients were disabled, and eligible for Medicaid coverage for substantial medical bills incurred as a result of their hospital visit.  In particular, Defendants' employees, with the knowledge and consent of its managers, intentionally and fraudulently

altered official Medicaid Employability Assessment Forms (known as Form 1663) to eliminate the option for the treating physician to certify to the Medicaid Program that the self-pay patient was "employable."

11.     Certifying on the Form 1663 that the self-pay patient was "employable" would, in nearly every circumstance, guarantee that Medicaid would deny coverage of the substantial medical bills incurred as a result of that patient's hospital visit.

12.     Defendants fraudulently altered the Form 1663 utilized in their client hospitals to eliminate the possibility that the treating physician would certify that the patient was "employable," which would eliminate Medicaid coverage, and lose significant revenue for Defendants.

13.     Relator is currently employed by Defendants as a PAR, in the State of Pennsylvania. Relator discovered Defendants' pattern and practice of submitting, and/or causing the submission, of false claims to the Medicaid Program for the conversion of self-pay (uninsured patients) to Medicaid coverage during his employment as a PAR. Relator has reported Defendants' fraudulent practices to Community Health Systems (owner of Phoenixville Hospital), to Defendants' compliance hotline, and to the Pennsylvania Attorney General's Office. Relator is the original source this information, as Relator provided all available information and documents to the government prior to filing the instant lawsuit.

14.     As a direct result of Defendant's improper practices, federal and state Medicaid Programs have paid false or fraudulent claims as reimbursement for costly medical treatment for self-pay (uninsured) patients who were not eligible for Medicaid coverage.

15.     The FCA was originally enacted during the Civil War, and later substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover

5

losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government, to disclose the information without fear of reprisals or Government inaction and to encourage the private bar to commit legal resources in prosecuting fraud on the Government's behalf.

16.     The Act provides that any person who knowingly submits, or causes the submission of a false or fraudulent claim to the U.S. Government for payment or approval, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of damages sustained by the Government. Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

17.     The Act allows any person having information about a false or fraudulent claim against the Government to bring an action for both himself and the Government, and to share in any recovery. The Act requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time), to allow the Government time to conduct its own investigation and determine whether to join suit.

18.     Based on these provisions, qui tam Plaintiff seeks through this action to recover, on behalf of the United States, damages and civil penalties arising from Defendants' making or causing to be made false or fraudulent records, statements and/or claims in connection with its pattern and practice of falsely and fraudulently representing that self-pay (uninsured) patients were disabled, and eligible for Medicaid coverage for substantial medical bills incurred as a result of their hospital visit.

## II.    PARTIES

### A.    Relator Daniel DiMarzio

19.    Relator Daniel DiMarzio is a resident of Pennsylvania and citizen of the United States, residing at 341 Vista Drive, Phoenixville, PA 19460.

20.    Relator was hired as a floating PAR by Defendant FirstSource USA in May 2010.

21.    Relator is currently employed as a floating PAR by Defendant FirstSource USA.

22.    As a floating PAR, Relator is not assigned by Defendant FirstSource USA to work at one particular hospital. Instead, Relator is/was required by Defendant FirstSource USA to work as a PAR at the following seven (7) hospitals located in Pennsylvania:

- Phoenixville Hospital, located at 140 Nutt Road, Phoenixville, PA 19460.

- St. Joseph's Medical Center, located at 2500 Bernville Road, Reading, PA 19605.

- Berwick Hospital Center, located at 701 East 16th Street, Berwick, PA 18603

- Geisinger Medical Center, located at 100 N. Academy Ave., Danville, PA 17822

- Heart of Lancaster Reg. Med. Ctr., located at 1500 Highlands Dr., Lancaster, PA 17543

- Lancaster General Hospital, located at 555 North Duke Street, Lancaster, PA 17602

- Brandywine Hospital, located at 201 Reeceville Road, Coatesville, PA 19320 (Brandywine's contact with FirstSource ended in or about 2010)

Defendant FirstSource USA also maintains contracts with the following four (4) hospitals in Pennsylvania:

- Regional Hospital of Scranton, located at 746 Jefferson Ave., Scranton, PA 18510

- Tyler Memorial Hospital, located at 5950 SR6, Tunkhannock, PA 18657

- Special Care Hospital, located at 128 W. Washington St., Nanticoke, PA 18634

- Carlisle Regional Med. Ctr., located at 361 Alexander Spring Rd., Carlisle, PA 17015

23.    Relator has also interacted with PARs and/or other employees of Defendant FirstSource USA located outside of Pennsylvania, including, but not limited to, those located in North Carolina.

24.    In his role as a PAR for Defendant FirstSource USA, Relator assists the ten (10) hospitals identified in above in Paragraph 23 with converting self-pay patients to coverage by the Medicaid Program for hosptial visits by:

- Interviewing all self-pay patients;

- Reviewing the patient's medical records;

- Completing the forms necessary for the Medicaid Program to assume coverage for the patient's inpatient treatment or emergency room visit, and any resulting medical treatment;

- Submitting those forms to the applicable county and/or state agency responsible for evaluating and approving Medicaid coverage for the patient's hospital visit, and any resulting medical treatment; and

- Following-up with the applicable county and/or state agency to ensure approval of Medicaid coverage for the patient's hospital visit, and any resulting medical treatment.

### B.    Defendant FirstSource Solutions LTD

25.    Defendant FirstSource Solutions Ltd is incorporated in India, with its registered address located at 5th Floor, Paradigm 'B' Wing, Mindspace Link Road, Malad (West), Mumbai 400 064.

26.    FirstSource is an international provider of customer-centric business process services.  With a network of 48 delivery centers spread across the United States, United

Kingdom, Philippines, India, and Sri Lanka, FirstSource provides services to organizations in the Healthcare, Communication, Publishing, Banking, Financial Services, and Insurance Industries.

27. FirstSource describes its services as: "Customer Management, Data Processing and Collections – complemented with best-of-breed processes, intellectual property (IP) assets, and quality of service to help clients not only improve customer satisfaction but also reduce operational costs, record process improvements and more importantly focus on core competence."

28. In the area of Healthcare, FirstSource has for more than 20 years been providing full-service business processing outsourcing solutions to both provider and payor clients in the United States.

29. FirstSource's clients in the Healthcare Industry include 5 of the top 10 health insurance/managed care companies in the United States, and more than 1,000 hospitals in the United States.

30. FirstSource describes the services it provides to the Healthcare industry as follows: "Rather than viewing clients' receivables, eligibility, collections and business office processes as a series of individual events; Firstsource delivers an assimilated process with the following integrated solutions:

- Premier Partnership Program (P3)
- Receivables Management
- MedAssist® Eligibility Services
- Collection Services
- Member Enrollment Services
- Innovative Staffing Solutions

- Physician Credentialing and Enrollment

- Contact Center Solutions

- Governmental Services

- Patient Financing (MAP™)

31.     FirstSource describes its "MedAssist® Eligibility Services" as including: "(1) self-pay conversion of patient accounts to a payer source through federal, state, and county programs and identification and follow-up for hospital charity and financial assistance programs; (2) Patient account representatives highly qualified and experienced with patient eligibility in all 50 states provide support for problems associated with local and state-specific regulations; (3) Patient advocacy reduces patient stress through education, emotional support, verifications and transportation; and (4) social services approach dedicated to treating every patient with dignity, compassion, and respect results in improved patient satisfaction."

**C.     Defendant FirstSource Solutions USA, LLC**

32.     Defendant FirstSource Solutions US, LLC is a wholly owned subsidiary of Defendant FirstSource Solutions, Ltd.

33.     FirstSource USA is a Foreign Limited Liability Corporation incorporated under the laws of the State of Florida, with its headquarters located at 1661 Lyndon Farm Court, Louisville, Kentucky 40223.

34.     FirstSource USA provides the services offered by Defendant FirstSource to clients located in the United States, including, but not limited to, more than 1,000 hospitals across the United States.  FirstSource USA's services include, but are not limited to, provide MedAssist® Eligibility Services to hospitals and healthcare clients throughout the United States.

35.     Thomas J. Watters currently serves as the Chief Executive Officer of FirstSource

USA, and is the President of FirstSource's Global Healthcare Solutions. Watters is described by FirstSource as "a key driving force behind the vision and growth of [Defendant] MedAssist, which was acquired by FirstSource."

### D. Defendant MedAssist Incorporated

36.   Defendant MedAssist Incorporated (also known as MedAssist Holding, Inc.) was incorporated in 1991 under the laws of the State of Kentucky.

37.   MedAssist was founded by Michael A. Shea.

38.   MedAssist handles billing, screening of patients for eligibility for government medical assistance, and debt collection for healthcare clients across the United States.

39.   As of December 2006, MedAssist had over 1,400 employees and over 1,000 clients in the United States. MedAssist reported revenues of $99 million for 2006.

40.   MedAssist was acquired by FirstSource USA in August 2007 for $330 Million.

41.   At the time the MedAssist acquisition was announced, FirstSource stated publicly that there would be no post-acquisition change in management or job cuts at MedAssist.

42.   Following the MedAssist acquisition, Michael Shea continued to serve as the President of MedAssist until April 2009. In April 2009, Michael Shea became an executive at FirstSource, holding various titles including Chief Executive Officer of North America at FirstSource.

43.   MedAssist's current Chief Executive Officer is Thomas J. Watters, who also serves as the Chief Executive Officer of Defendant FirstSource USA.

44.   MedAssist is presently headquartered at 1661 Lyndon Farm Court, Louisville, Kentucky 40223, also the headquarters of Defendant FirstSource USA.

## III. JURISDICTION AND VENUE

45.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367 and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3720. Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator, moreover, would qualify under that section of False Claims Act as an "original source" of the allegations in this Complaint, even had such a public disclosure occurred. Relator provided all available information and documents to the government prior to filing the instant lawsuit.

46.     This Court has personal jurisdiction and venue over Defendants pursuant to 28 U.S.C. §§ 1391(b) and 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, Defendants can be found in and transact business in the Eastern District of Pennsylvania. Specifically, Defendants provide MedAssist® Eligibility Services for hospitals within the Eastern District of Pennsylvania, including Phoenixville Hospital.

47.     Venue is proper in this District pursuant to 31 U.S.C. § 3731(a) because Defendants can be found in and transacts business in the Eastern District of Pennsylvania. At all times relevant to this Complaint, Defendants regularly conducted substantial business within the Eastern District of Pennsylvania, maintained employees and offices in the Eastern District of Pennsylvania, and performed a significant number of the fraudulent acts described herein within the Eastern District of Pennsylvania.

## IV.  APPLICABLE LAW

### A.  Background on Federal and State-Funded Health Insurance Programs

#### i.  The Medicare Program

48.    In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

49.    Medicare now has three parts: Part A; Part B, and the recently enacted Part D Program.

50.    Medicare Part A (Hospital Insurance) helps cover inpatient care in hospitals, including critical access hospitals, and skilled nursing facilities (not custodial or long-term care). Medicare Part A also helps cover hospice care and some home health care.

51.    Medicare Part B (Medical Insurance) helps cover doctors' services and outpatient care, as well as other medical services not covered by Part A. Part B also helps pay for covered health services and supplies when they are medically necessary.

52.    Medicare Part D (Prescription Drug Plan) provides beneficiaries with assistance in paying for out-patient prescription drugs

53.    Payments from the Medicare Program come from a trust fund – known as the Medicare Trust Fund – which is funded through payroll deductions taken from the work force, in addition to government contributions. Over the last forty years, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

54. The Medicare Program is administered through the United States Department of Health and Human Services ("HHS") and, specifically, the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

55. Much of the daily administration and operation of the Medicare Program is managed through private insurers under contract with the federal government.

56. Under Medicare Part A, contractors serve as "fiscal intermediaries," administering Medicare in accordance with rules developed by the Health Care Financing Administration ("HCFA").

57. Under Medicare Part B, the federal government contracts with insurance companies and other organizations known as "carriers" to handle payment for physicians' services in specific geographic areas. These private insurance companies, or "Medicare Carriers", are charged with and responsible for accepting Medicare claims, determining coverage, and making payments from the Medicare Trust Fund.

58. Under Medicare Part D, Medicare beneficiaries must affirmatively enroll in one of many hundreds of Part D plans ("Part D Sponsors") offered by private companies that contract with the federal government. Part D Sponsors are charged with and responsible for accepting Medicare Part D claims, determining coverage, and making payments from the Medicare Trust Fund.

59. The principal function of both intermediaries and carriers is to make payments for Medicare services, and to audit claims for those services, to assure that federal funds are spent properly.

60. To participate in Medicare, providers must assure that their services are provided economically and only when, and to the extent they are medically necessary. Medicare will only

reimburse costs for medical services that are needed for the prevention, diagnosis, or treatment of a specific illness or injury.

## ii. The Medicaid Program

61. Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

62. The Medicaid program was established in 1965 when Congress enacted Title VII of the Social Security Act. The Medicaid program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people. Medicaid is the largest source of funding for medical and health-related services for America's poorest people.

63. Medicaid is a cooperative federal-state public assistance program which is administered by the states.

64. Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program. Federal support for Medicaid is significant. For example, the federal government provides 50% of the funding for New Jersey Medicaid, the remaining 50% of funds is received from the state. The federal government's contribution, which varies by state, is known as the Federal Medicaid Assistance Percentage ("FMAP").

65. Title XIX of the Social Security Act allows considerable flexibility within the States' Medicaid plans and therefore, specific Medicaid coverage and eligibility guidelines vary from state to state.

66. However, in order to receive federal matching funds, a state Medicaid program

must meet certain minimum coverage and eligibility standards. A state must provide Medicaid coverage to needy individuals and families in five broad groups: pregnant women; children and teenagers; seniors; people with disabilities; and people who are blind. In addition, the state Medicaid program must provide medical assistance for certain basic services, including inpatient and outpatient hospital services.

### iii. Medicaid Eligibility

67.     In Pennsylvania, a person may be eligible for General Assistance or Medical Assistance through the Medicaid Program on the basis of a temporary or permanent disability which precludes them from working in any gainful employment.     55 PA ADC § 141.61(c)(1)(iii).

68.     For someone to be eligible to receive General Assistance or Medical Assistance from the Pennsylvania Medicaid Program on the basis of disability, a doctor, psychologist, or psychiatrist must complete an Employability Assessment Form (EAF) (PA 1663), stating that the person is temporarily or permanently unable to work.

69.     The applicable County Assistance Office (CAO) reviews the completed (EAF) (PA 1663) and determines whether the individual is eligible for General Assistance or Medical Assistance based upon the medical provider's opinion indicated on the EAF (PA 1663).

70.     The Employment Assessment Form (PA 1663), created by the Pennsylvania Department of Public Welfare, is the official form which must be utilized to determine eligibility for General Assistance or Medical Assistance on the basis of disability.

71.     The EAF (PA 1663) was last updated by the Pennsylvania Department of Public Welfare in August 2007.  A copy of the EAF (PA 1663) is attached hereto as Exhibit A.

72.     The EAF (PA 1663) contains four check-boxes, with each check-box indicating a

different level of disability. The four check-boxes on the EAF (PA 1663) are as follows:

- **Permanently Disabled** – Has a physical or mental disability which permanently precludes any gainful employment. The patient is a candidate for Social Security Disability or SSI.

- **Temporarily Disabled – 12 months or more** – Is currently disabled due to a temporary condition as a result of an injury or an acute condition and the disability temporarily precludes any gainful employment. The temporary disability began __[Date]___ and is expected to last until __[Date]__. The patient may be a candidate for Social Security Disability or SSI benefits.

- **Temporarily Disabled – Less than 12 months** – is currently disabled due to a temporary condition as a result of an injury or an acute condition and the disability temporarily precludes any gainful employment. The temporary disability began __[Date]___ and is expected to last until __[Date]__.

- **Employable** – The patient's physical and/or mental condition is such that he or she can work.

73.    If the physician completing the EAF (PA 1663) checks the box for "Employable," and the "no" box is checked on PA Form 1671 (indicating that the individual does not require health-sustaining medication), the individual is ineligible for General Assistance or Medical Assistance from the Pennsylvania Medicaid Program on the basis of disability. See 55 PA ADC § 141.61(c)(1)(iii).

**B.    Federal False Claims Act**

74.    The federal FCA provides, in pertinent part:

(a)    Any person who: (1) knowingly presents, or causes to be presented, to an officer or employee of the United States government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false claim allowed or paid, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, plus three (3) times the amount of damages which the Government sustains as a result of the act of that person.

(b)     For purposes of this section, the term "knowing" and "knowingly" mean that a person, with respect to information: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent is required.

## V.     FRAUD ALLEGATIONS

### A.     Defendants Fraudulently Altered Thousands of EAFs (PA 1663) Resulting in Numerous False Claims to the Medicaid Program for Costly Medical Bills

75.     Defendants' provide their client hospitals with MedAssist® Eligibility Services by staffing those hospitals with employees, known as Patient Account Representatives ("PARs"). Defendants' PARs assist client hospitals with converting self-pay patients to the Medicaid Program for hospital visits by:

- Interviewing all self-pay patients;

- Reviewing the patient's medical records;

- Completing the forms necessary for the Medicaid Program to assume coverage for the patient's inpatient treatment or emergency room visit, and any resulting medical treatment;

- Submitting those forms to the applicable county and/or state agency responsible for evaluating and approving Medicaid coverage for the patient's hospital visit, and any resulting medical treatment; and

- Following-up with the applicable county and/or state agency to ensure approval of Medicaid coverage for the patient's hospital visit, and any resulting medical treatment.

#### i.     Defendants' Require their PAR's to Utilize an Altered EAF (PA 1663)

76.     When Relator began working as a PAR for Defendant FirstSource USA in May 2010, his supervisors provided him with the EAF (PA 1663) that he was to use in assisting

18

FirstSource's client hospitals with converting self-pay patients to the Medicaid Program for costly hospital visits.

77. The EAF (PA 1663) that Defendant FirstSource USA provided to Relator, and instructed him to use for all of FirstSource's client hospitals, had only three check-boxes. The box on the EAF (PA 1663) that FirstSource USA instructed Relator to use had been altered to remove the check-box for the physician to indicate that the patient was "Employable" (hereafter referred to as the "Altered EAF").

78. Relator, having no prior experience as a PAR, was unaware that the Altered EAF he was instructed to use by Defendant FirstSource USA was in any way improper or illegal.

79. As a floating PAR, Relator was required to work at ten (10) of FirstSource USA's hospital clients in Pennsylvania, including:

- Phoenixville Hospital, located at 140 Nutt Road, Phoenixville, PA 19460.
- St. Joseph's Medical Center, located at 2500 Bernville Road, Reading, PA 19605.
- Berwick Hospital Center, located at 701 East 16th Street, Berwick, PA 18603
- Regional Hospital of Scranton, located at 746 Jefferson Ave., Scranton, PA 18510
- Tyler Memorial Hospital, located at 5950 SR6, Tunkhannock, PA 18657
- Special Care Hospital, located at 128 W. Washington St., Nanticoke, PA 18634
- Geisinger Medical Center, located at 100 N. Academy Ave., Danville, PA 17822
- Carlisle Regional Med. Ctr., located at 361 Alexander Spring Rd., Carlisle, PA 17015
- Heart of Lancaster Reg. Med. Ctr., located at 1500 Highlands Dr., Lancaster, PA 17543

  Lancaster General Hospital, located at 555 North Duke Street, Lancaster, PA 17602

80. At each one of these ten (10) hospitals in Pennsylvania, Relator repeatedly saw FirstSource employees utilizing the Altered EAF, and submitting those Altered EAF's to the

applicable County Assistance Office for approval of Medicaid coverage. In fact, Relator did not see FirstSource employees utilize any version of the EAF (PA 1663) other than the Altered EAF that FirstSource had instructed its employees to use. Copies of Altered EAF's submitted by FirstSource, with patient identifying information redacted, are attached hereto as Exhibit B.

81. MedAssist, upon information and belief, also utilized the Altered EAF at its client hospitals in Pennsylvania prior to the MedAssist acquisition by FirstSource USA in August 2007. Prior to the MedAssist acquisition, FirstSource USA did not provide MedAssist Eligibility Services to hospitals in the United States. Instead, FirstSource USA took over management of MedAssist's ongoing business, which included screening patients for eligibility for government medical assistance for over 1,000 clients throughout the United States.

ii. **Relator Learns that FirstSource USA Fraudulently Altered the EAF (PA 1663) Utilized at FirstSource's Client Hospitals**

82. Within the first few weeks of working for FirstSource USA in 2010, Relator met with Kirsten Baxter, a manager and trainer for FirstSource USA. Relator observed Ms. Baxter white-out a portion of a blank EAF (Pa 1663), photocopy that form, provide the photocopy to him, and shred the original. Ms. Baxter told Relator that the whited-out photocopy she provided to him was to be provided to physicians in the course of his duties as a PAR. Ms. Baxter also said that whited-out photocopy was approved by, and used by, FirstSource USA's Regional Manager for the East Coast, Kevin Thomas. At that time, Relator did not understand the significance of what he had observed, as the forms and the job were new to him.

83. On January 12, 2012, Nicole Zelcs, a FirstSource USA PAR at Phoenixville hospital sent an email to Relator and Susan Wilson, another FirstSource USA PAR, in which Zelcs stated "On the 1663 the box that has the patient is employable needs to be whited out, because they will not get MA if it is checked so we don't give the doctors that option." It was

then that Relator realized the significance of Ms. Baxter's actions in whiting out the bank EAF (Pa 1663) when she trained him in 2010.

84.     Prior to receiving January 12, 2012 email from Nicole Zelcs, Relator was not aware that the EAF (Pa 1663) utilized by FirstSource throughout Pennsylvania was improper and had been fraudulently altered by FirstSource.

### iii.     Relator Reports FirstSource USA's Use of the Fraudulently Altered EAF to the Compliance Hotline for Phoenixville Hospital

85.     On February 8, 2012, Relator, concerned about FirstSource USA's repeated use of fraudulently Altered EAFs, telephoned the corporate compliance hotline for the Community Health Systems Professional Services Corporation (hereafter "CHS"), the parent corporation of Phoenixville Hospital. During that hotline call, Relator reported that FirstSource USA had been repeatedly using the Altered EAF at Phoenixville Hospital, and explained that the Altered EAF had removed the check-box for the physician to indicate that the patient was "Employable." Relator was given the identification code 1202-CYH-10020 by the CHS Compliance Hotline.

86.     On February 9, 2012, Relator telephoned the Medical Assistance Provider Hotline, established by and located in the Pennsylvania Department of Public Welfare's Bureau of Program Integrity. During that hotline call, Relator spoke with an individual named "Christine," and reported that FirstSource USA had been repeatedly using the Altered EAF at hospitals in Pennsylvania, and explained that the Altered EAF had removed the check-box for the physician to indicate that the patient was "Employable."

87.     Following his February 9, 2012 report to the DPW Hotline, Relator spoke on several occasions with Thomas Babcock, Senior Supervisory Fraud Auditor at the Pennsylvania Attorney General's Office, about FirstSource USA's repeated use the Altered EAF at hospitals in Pennsylvania.

88.     On February 14, 2012, Relator telephoned the corporate compliance office for FirstSource USA to report his concerns about FirstSource USA's repeated use the Altered EAF at hospitals in Pennsylvania. Relator was given the identification code 1202MAI100 by the FirstSource USA Corporate Compliance Department.

### iv.     Defendants Abruptly Stop Using the Altered EAFs Following Relator's Report to FirstSource USA's Compliance Hotline

89.     On February 15, 2012, the day after Relator telephoned FirstSource's Compliance Department, Relator was copied on an email from Carmen Sessoms, Regional Vice President at FirstSource USA. In that email, with the subject "PA 1663 Forms," Ms. Sessoms stated: "Please destroy all PA 1663 Employment Assessment forms immediately. Do not reuse forms in your possession. Pull new forms immediately from http:/www.dpw.state.pa.us/findaform/index.htm. Enter 1663 in the field "Publication/Form Number" and click "Find Form." There are Spanish and English versions of this form that are current for immediate use."

90.     On March 2, 2012, Relator was copied on an email from Anthony Brown, Pennsylvania Eligibility Supervisor for FirstSource USA. In that email, with the subject "1663 Audit," Mr. Brown states, in relevant part, as follows:

> I was asked to do an audit and remove any 1663 that was inaccurate. I have done that in both room#201 and in the ER area by going through every one of your files. However, if the doctors are currently completing an inaccurate form, I am asking that you would put that form off to the side, and give it to me directly. You can then ask the doctor to complete the updated form that was sent to you last week.
>
> This is somewhat a setback, I know. But, we have to make sure the new 1663 is being used going forward.

### v.     Defendants Submitted Thousands of Fraudulently Altered EAF's to County Assistance Programs in Pennsylvania for Medicaid Coverage

91.     Between May 2010 and February 15, 2012, Relator personally observed that

FirstSource USA utilized exclusively the fraudulently Altered EAF at ten (10) client hospitals in Pennsylvania.

92.    During that time period, May 2010 to February 15, 2012, FirstSource USA submitted thousands of Altered EAF's to County Assistance Programs in Pennsylvania for Medicaid Coverage for costly medical bills incurred by self-pay (uninsured) patients at FirstSource USA's client hospitals.

93.    Hospital Inventory reports from FirstSource USA, dated February 20, 2102, indicate that FirstSource USA had submitted, or were in the process of submitting, the following number of EAF's for certain of its client hospitals in Pennsylvania:

- Phoenixville Hospital – 631 EAFs

- St. Joseph's Medical Center – 661 EAFs

- Berwick Hospital Center – 325 EAFs

- Geisinger Medical Center, 1,606 EAFs

- Carlisle Regional Med. Ctr. – 548 EAFs

- Heart of Lancaster Reg. Med. Ctr. – 693 EAFs

- Regional Hospital of Scranton – 87 EAFs

The numbers appearing on the Hospital Inventory reports referenced above are typical for these hospitals during Relator's employment as a Floating PAR for Defendant FirstSource USA.

94.    Based upon the Hospital Inventory reports identified in Paragraph 93, and Relator's experience and observations as a FirstSource USA PAR, Defendants have submitted, or caused the submission of, thousands of fraudulently Altered EAFs to the Pennsylvania Medicaid Program.

95.    In the short time since Defendants' stopped using the fraudulently Altered EAFs,

on February 15, 2012, Relator understands that the number of EAFs submitted by FirstSource USA for the ten (10) hospitals in Pennsylvania has decreased significantly.

### vi. Defendants Submission of Fraudulently Altered EAFs Resulted in the Payment of Thousands of False Claims to the Medicaid Program

96. By knowingly and intentionally submitting, or causing to be submitted, thousands of fraudulently Altered EAFs, which are claims for coverage of medical expenses by the Medicaid Program, Defendants repeatedly violated the federal False Claims Act, 31 U.S.C. § 3729, et seq.

97. Defendants scheme to submit fraudulently Altered EAFs resulted in the Medicaid Program paying thousands of false claims for medical expenses incurred during hospital visits by individuals who were not permanently or temporarily disabled and, therefore, not eligible for Medicaid coverage, in violation of the False Claims Act.

98. In Relator's experience as a FirstSource PAR, the majority of the self-pay (uninsured) patients who were treated at FirstSource's client hospitals in Pennsylvania were not permanently or temporarily disabled. In fact, most of these self-pay (uninsured) patients were currently employed, or were physically and mentally able to work.

99. Additionally, because they lack health insurance, and a primary care physician, self-pay (uninsured) patients frequently seek treatment at emergency rooms for conditions that are not life-threatening, or that render them permanently of temporarily disabled.

100. After learning of FirstSource USA's fraudulent altering of the EAF (PA 1663), Relator spoke with Kevin Kramer, D.O., the head emergency room physician at Phoenixville Hospital. That physician told Relator that had the EAFs FirstSource USA presented to him had a check-box for "employable," he would have checked that box for most of the self-pay (uninsured) patients he treated in the emergency room.

101. Defendants', however, sought to maximize the number of patients converted from self-pay to Medicaid coverage by fraudulently altering the EAF (PA 1663) to prevent the treating physician from checking the box indicating that the patient was "employable," and therefore ineligible for Medicaid coverage.

102. Defendants had a clear financial incentive to commit this fraud, as they were compensated by their client hospitals only for those patients who were successfully converted from self-pay to Medicaid coverage. Moreover, FirstSource USA placed financial quotas on its employees that were based upon the number of patients successfully converted from self-pay to Medicaid coverage.

## Count I
## VIOLATION OF FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a) (1) (A), 31 U.S.C. § 3729(a) (1) (B)

103. Relator realleges Paragraphs 1 through 102 as though fully set forth herein.

104. Defendants knowingly presented, and/or caused to be presented fraudulently Altered EAFs falsely claiming payment for costly medical expenses incurred by individuals who were not actually eligible for Medicaid coverage.

105. Claims submitted by Defendants to Medicaid for medical expenses incurred by individuals who were not eligible for Medicaid coverage constitute violations of the federal False Claims Act, 31 U.S.C§ 3729 (a)(1)(A).

106. Defendant, through their concerted efforts to carry out its systematic scheme to obtain fraudulent payments from Medicaid, caused to be made or used false records or statements (namely false and fraudulent EAFs), to get false or fraudulent payments in violation of the federal False Claims Act, 31 U.S.C.§ 3729 (a)(1)(B).

107. All of Defendants' conduct described in the Complaint was knowing, as that term

is used in the federal False Claims Act.

WHEREFORE, Relator requests the following relief:

A.    Judgment against Defendants in an amount equal to:

      (1)    Damages of up to three (3) times the amount of damages sustained by the United States as a result of Defendant's actions;

      (2)    A civil penalty of $11,000 for each violation of the federal False Claims Act.

B.    25% of the proceeds of this action if the United States elects to intervene, and 30% of the proceeds of this action if the United States elects not to intervene.

C.    Relator's attorneys' fees, costs and expenses; and

D.    Such other relief as the Court deems appropriate.

## JURY DEMAND

Relator demands trial by jury for all claims for which such jury is available.

Respectfully Submitted,

PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP

BY: _____

Marc S. Raspanti, Esquire
Michael A. Morse, Esquire
Douglas K. Rosenblum, Esquire
PA ID Nos: 41350; 80507; 90989
1818 Market Street, Suite 3402
Philadelphia, PA 19103
(215) 320-6200

Attorneys for Qui Tam Plaintiff
Daniel DiMarzio

Dated: _____3 | 23 | 2012_____

2234820/6



12-CV-1464
Under Seal

JS 44 (Rev. 12/07) **PBT** **CIVIL COVER SHEET**

12 1464

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
UNITED STATES OF AMERICA, ex rel.
DANIEL DiMARZIO

**DEFENDANTS** FIRSTSOURCE SOLUTIONS LTD:
FIRSTSOURCE SOLUTIONS USA, LLC; AND
MEDASSIST, INC.

**(b)** County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant **Foreign Country**
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number) Michael A. Morse
Pietragallo Gordon Alfano Bosick & Raspanti,LLP
1818 Market St.,Phila. PA 19103 215-320-6200       Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☑ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | **PERSONAL INJURY** | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | Slander | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | ☐ 330 Federal Employers' | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | Liability | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | ☐ 340 Marine | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 345 Marine Product | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | Liability | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 355 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | Product Liability | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | ☐ 360 Other Personal | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | Injury | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☑ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**):
False Claims Act, 31 U.S.C. Section 3729, et seq.
Brief description of cause:
False Claims Act - Qui Tam Case

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $ _____
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions):
JUDGE _____
DOCKET NUMBER _____
MAR 23 2012

DATE
3/23/12

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**
Michael A. Morse

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____